1  McGREGOR W. SCOTT
   United States Attorney
2  HEIKO P. COPPOLA
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone:  (916) 554-2700
   Facsimile:  (916) 554-2900
5

6  Attorneys for Plaintiff
   United States of America
7

8              IN THE UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11 UNITED STATES OF AMERICA,                CASE NO.  2:20-MJ-0096 DB

                          Plaintiff,        UNITED STATES' MEMORANDUM IN SUPPORT
12                                          OF CONTINUED DETENTION

13             v.                           DATE: July 31, 2020
                                            TIME: 2:00 p.m.
14 TANG JUAN,                               COURT: Hon. Debra Barnes

                          Defendant.
15

16

17                      I.    **INTRODUCTION**

18        On July 29, 2020, defendant Tang Juan ("Tang") filed a motion for bail review pursuant to 18

   U.S.C. § 3141, *et. seq.*  The United States opposes Tang's motion for bail.  Tang is an active duty
19
   member of the Chinese military's scientific community, who lied to gain entry into the United States,
20
   attempted to destroy evidence, and lied extensively to the FBI when interviewed.  It also appears that
21
   Tang's present case is not an isolated instance of Chinese military members unlawfully gaining
22
   admission to the United States through visa fraud.  Because she is a serious flight risk, the Court should
23
   order Tang's continued detention during the pendency of this criminal case.
24
                        II.    **FACTUAL BACKGROUND**
25
          The United States proffers the following information, some of which is contained in the criminal
26
   complaint and some of which is drawn from other sources, to provide a fuller record to the Court of the
27
   relevant facts regarding Tang's detention.  The United States submits that the similar cases from the
28

Northern District of California and the Southern District of Indiana provide valuable context for the Court's consideration of Tang's bail motion.[1]

### A.   Tang Juan

Tang applied for a United States Non-Immigrant J-1 Visa ("NIV") on or about October 28, 2019, which was issued on or about November 5, 2019.  According to the Department of State website, a J-1 visa is a non-immigrant document "for individuals approved to participate in work-and study-based exchange visitor programs."  Department of State records reflect that Tang intended to conduct cancer treatment-method research at the University of California, Davis ("UCD").  On or about December 27, 2019, Tang entered the United States through San Francisco International Airport.

On Tang's visa application, under the Additional Work/Education/Training section, Tang answered "no" when responding to the question: "have you ever served in the military?"  Similarly, Tang also responded in the negative to questions related to communist party membership and whether she had any special chemical or biological experience.  The FBI's investigation determined Tang's answers to these questions was false.

Specifically with respect to Tang's military service, through an internet search, the FBI discovered a photograph of Tang wearing a Peoples Liberation Army – Air Force ("PLAAF) uniform bearing the insignia of the Civilian Cadre, attached to a Chinese news article about a forum in Xi'an, China published on or about April 14, 2019. Tang was listed as one of four experts invited to the forum and was further introduced in the article, wearing what appeared to be a military uniform, and listing her employment as an associate researcher at Air Force Military Medical University, Molecular Medicine Translation Center.  Members of the PLAAF Civilian Cadre are considered active duty military members.  Additional open source internet searches revealed other articles about Tang and listed her affiliation with Air Force Military Medical University/Fourth Military Medical University and China People's Liberation Air Force Military Medical University Molecular Medicine Translation Center.

On June 20, 2020, FBI agents interviewed Tang at her residence in Davis, California prior to the

---

[1] The factual bases set out in this pleading for Chen Song, Xin Wang, L.T., and Kaikei Zhao are taken from the Government's Motion For Pretrial Detention Pursuant to 18 U.S.C. § 3142 filed in Southern District of Indiana Case Number 1:20-MJ-0589-DML.

1    execution of the search warrant.  Tang appeared to be moving out of her residence when the FBI made

2    contact.  Tang admitted to personally preparing and submitting the NIV application but denied serving

3    in the Chinese military and adamantly denied being a member of the Civilian Cadre.  Tang claimed that

4    wearing a military uniform was required for attendance at FMMU because it was a military school.

5    Tang further stated that she didn't know the meaning of the insignia on the PLAAF uniform and claimed

6    that the majority of students at FMMU had the same insignia and ribbons.  Upon completion of the

7    interview, FBI agents executed the search warrant at Tang's residence, seizing electronic media, and her

8    Chinese passport.  Agents found Tang's J-1 visa within her Chinese passport.

9           During a later review of the electronic media evidence seized from Tang, agents discovered a

10   myriad of different photographs of Tang wearing a military uniform.[2]  Agents also found a video

11   depicting a presentation conducted by Tang in which she is wearing what appears to be the PLAAF

12   military uniform found in their open source search and she begins the presentation with a salute.  The

13   video presentation was recorded in the weeks before Tang entered the United States on the J-1 visa.

14          Agents also found evidence of Tang's affiliation with the Chinese Communist Party. This

15   consisted of an application to apply for government benefits in which Tang stated that she was a

16   member with the Communist Party.  Agents discovered Chinese military documents that detailed Tang's

17   research related to antidotes for biological agents.

18          Following the search warrant, FBI agents assess that Tang, along with her mother and daughter

19   fled to the Chinese consulate in San Francisco.  Tang, her mother, and daughter had ticketed flight

20   reservations for China on June 28, 2020, although Tang's daughter left for China on June 21, 2020.

21   Tang's mother departed for China on July 26, 2020.  Tang remained in the Chinese consulate for

22   approximately a month prior to her arrest.

23          On June 26, 2020, the Court issued a sealed criminal complaint and a warrant for Tang's arrest

24   pursuant to 18 U.S.C. § 1546(a).  On July 20, 2020, after the complaint and arrest warrant were unsealed

25   by the Court, the United States provided a copy of complaint and arrest warrant to the Chinese consulate

26

27          [2] The items discovered by FBI agents on the electronic media belonging to Tang had all been
     deleted but not yet overwritten by other data.  As such, the FBI was able to retrieve and view the deleted
28   data.

personnel in San Francisco.  In the evening hours of July 23, 2020, FBI agents met with members of the Chinese consulate but were unsuccessful in their efforts to negotiate Tang's surrender.[3]  Surveillance later observed Tang leaving the Chinese consulate in a vehicle and being dropped off at a local hospital with her mother.  At the conclusion of treatment and following her discharge, FBI agents arrested Tang at approximately 9:45 p.m. and later transported her to the Sacramento.  Since Tang's arrest, the Department of Homeland Security has lodged an immigration detainer and the Department of State has revoked her J-1 visa.

### B.   Chen Song – Northern District of California (20-MJ-70968 MAG)

Chen Song ("Song") applied for and received a J-1 visa to enter the United States in November 2018, with the stated purpose of conducting research at Stanford University ("Stanford").  On her visa application, under penalty of perjury, Song stated that her military service had ended in 2011, when she graduated from the Fourth Military Medical University ("FMMU"), which is subordinate to the Air Force component of the PLA.  Song also stated that her employer at the time of her visa application was Xi Diaoyutai Hospital at No. 30 Fucheng Road in Beijing.  On December 23, 2018, Song was admitted to the United States on a J-1 visa, and she subsequently began work at Stanford University, conducting neurological research.

Following Song's admission to the United States, the FBI developed information that she was, in fact, still a PLA member, and was in the United States on false pretenses.  Specifically, the FBI identified from open sources both a photograph of Song in the uniform of the Civilian Cadre of the PLA,[4] and publications in which Song described her institutional affiliation with the PLA Air Force General Hospital and FMMU.

On July 13, 2020, Song was voluntarily interviewed by the FBI in conjunction with the execution of a search warrant at her residence in California.  During the course of that interview, Song adamantly denied a continuing affiliation with the PLA beyond the 2011 date she noted in her visa

---

[3] This meeting took place at location separate from the Chinese consulate.

[4] According to the Ministry of National Defense of the People's Republic of China, found at http://www.mod.gov.cn/policy/2009-07/14/content_3100988.htm, Civilian Cadres of the People's Liberation Army are active military personnel who have been appointed to junior professional technical positions or clerical ranks and above.  The FBI has assessed that members of the Civilian Cadre are active military personnel.

application.  When asked about the multiple research articles published in conjunction with PLA institutions after that 2011 date, Song claimed that one 2012 article was due to a delay in publication but refused to explain how more recent articles came to be published despite her professed lack of affiliation with the PLA.

Following that interview, the FBI conducted a forensic examination of Song's computer and recovered a folder, deleted from Song's hard drive on June 21, 2020, named, "2018 Visiting School Important Information," in Chinese.  In that folder FBI agents recovered a letter from Song to the Education Section within the PRC Consulate in New York, explaining that Song was seeking authorization from the PLA Air Force and FMMU to stay in the United States for another year.  Song wrote that the employer listed in her visa application, Beijing Xi Diaoyutai Hospital, was a false front, and that she had obtained approval for her extension from both the PLA Air Force and FMMU to extend her stay. Song further explained that the PLA Air Force and FMMU approval documents were classified so she was not able to transmit them to the PRC New York Consulate online, but instead was attempting to ship the documents via UPS.

Also recovered from the same deleted folder were an image of Song's PLA credentials, covering the period July 2016 to July 2020 issued by the Air Force General Hospital Political Department, which included a photograph of Song in military uniform and referencing her department as the Air Force General Hospital and rank of Civilian Cadre Level 5.  A resume for Song, which included a photograph of Song in uniform and lists her employer from September 2011 to the present as the Department of Neurology, Air Force General Hospital, was also found in that folder.

C.    **Xin Wang – Northern District of California (CR 20-251 JD)**

Xin Wang ("Wang") is a Chinese national who was in the United States on a J-1 visa.  On June 7, 2020, Wang was arrested at Los Angeles International Airport ("LAX") while attempting to depart the United States for China.  Wang was subsequently indicted in the Northern District of California on visa fraud charges.

According to court filings in that case, Wang was a researcher at the University of California,

San Francisco ("UCSF").  Wang's J-1 visa application stated he had been affiliated with FMMU and that his military service in China had ended in 2016.  In or around May 2020, Wang informed his supervising professor at UCSF that his employer, FMMU, had recalled him and 16 similarly employed colleagues in the United States back to China.  On June 7, 2020, Wang was interviewed by United States Customs and Border Patrol ("CBP") officials at Los Angeles International Airport as he attempted to leave the United States.  During that interview, Wang was initially evasive, but subsequently admitted that he was, in fact, an active duty member in the PLA, at a level that roughly corresponded with the rank of Major in the United States Army.  Wang further admitted that he was employed by FMMU, which is subordinate to the Air Force branch of the PLA.  Wang told CBP he intentionally lied on his visa application to increase the likelihood of receiving a visa, and that he was instructed by his supervisor in China, the director of the FMMU lab at which he worked, to observe and document the layout of the UCSF lab to replicate it when he returned to China.  Wang admitted he had deleted all of his WeChat messaging content from his personal mobile phone before arriving at LAX.  A subsequent search of Wang's electronic devices uncovered scientific studies from UCSF, which Wang said he planned to share with his PLA colleagues upon his return to the PRC.  Wang also admitted he had previously emailed UCSF research to his PLA laboratory.

### D.     L.T.

Like Wang and Tang, L.T. was a Chinese national who entered the United States on a J-1 visa. L.T. entered the United States in February of 2019, and was conducting research at Duke University. On July 12, 2020, L.T. was interviewed by CBP at LAX while attempting to depart the United States. L.T. was initially evasive during the interview, but ultimately admitted that she was affiliated with the PLA General Hospital and PLA Medical Academy.  L.T. further stated that she had been contacted by the Chinese embassy on or around July 4, 2020, and was instructed to visit the Department of Education at the embassy.  While at the embassy, L.T. and four other students met with a man they called, "the teacher."  L.T. stated that the man spoke to them about how to apply for a visa extension and COVID-19 precautionary measures, and instructed them to delete or reset all their electronic media prior to departing the United States because U.S. Customs officers would be interviewing them before they boarded the plane.  L.T. further stated that, in July 2020, she spoke with a woman at the Chinese

embassy who controlled the China Scholarship Council fund.  The woman offered to help L.T. receive a stipend from the scholarship that would pay for L.T.'s flight back to China.  According to L.T., when she arrived at LAX for her flight back to China, Xiamen Airlines personnel told her that CBP was going to be interviewing her, and instructed her to wipe her devices.  L.T. told CBP officers that she then used WeChat to call her contact at the embassy, who advised her to stay calm, delete her phone, and answer CBP's questions.

### E.      Kaikai Zhao – Southern District of Indiana (1:20-MJ-0589 DML)

Zhao applied for a United States Non-Immigrant Visa ("NIV") in  June 2018 and was issued an F1 Visa for a PhD program studying machine learning and artificial intelligence at Indiana University (IU) in Bloomington, Indiana.  In his visa application, Zhao answered "No" to the question "Have you ever served in the  military?"

As outlined in greater detail in the criminal complaint filed in the Southern District of Indiana, the FBI subsequently uncovered information establishing that Zhao served in the PRC's People's Liberation Army ("PLA").  That information included, among other things, the discovery of a picture of Zhao in a PLA Air Force uniform associated with a published article on air combat radar technology.

The FBI surveillance on July 17, 2020 observed Zhao meeting in Bloomington with two officials from the PRC Chicago Consulate in a public park close to his residence.  That meeting was significant to the FBI, as Zhao's visa application is one of several PRC/PLA member visa applications under scrutiny by the FBI, and, as outlined below, by July 17 a number of other PLA members had already been apprehended and/or charged with visa fraud in other parts of the country.  The meeting between Zhao and Consulate officials lasted approximately forty-five minutes, after which the PRC Consulate officials departed.

The FBI subsequently conferred with the U.S. Department of State, Office of Foreign Missions ("OFM"), on the observed visit between Zhao and PRC Chicago Consulate officials.  Agents learned

that when consulate staff travel beyond 25 miles from the consulate by car, they are required to file a Travel Notification form with OFM outlining their destination, route of travel, the reason for the trip, the identities of all consulate staff who will be traveling and the identities of those whom they will be meeting with at their destination.  In this instance, the PRC Chicago Consulate notified OFM that four people, including at least one Consul and one Vice Consul, would be traveling from the Consulate to Bloomington on July 17, 2020, to meet with a female (presumably a student) at a residential address on the east side of Bloomington.  A meeting with Zhao was not mentioned in the Consulate's notice to OFM, and the address provided in the notification to OFM is approximately 4.5 miles away from where ZHAO was residing.  The notification further indicated the Consulate staff intended to spend 30 minutes at the specific address in Bloomington, before departing for another 30 minute visit in northern Indiana and ultimately returning to Chicago.  The consulate further notified OFM that the purpose of the trip was to provide health packages (masks and wipes) to Chinese students.

On July 18, 2020, a federal search warrant was executed at Zhao's residence in Bloomington. Pursuant to that warrant, FBI agents recovered a number of electronic devices and documents.  In a trash can next to Zhao's bed, Agents also discovered and seized documents that appeared to have been recently ripped up by hand and discarded.  Agents were subsequently able to reconstruct those documents, and determined that it was a printed copy of Zhao's Online Non-Immigrant Visa Application, Department of State Form 160 (DS-160).  It appears that the document was printed out on June 25, 2018, and included a map to the U.S. Embassy in Beijing.  The map was also torn up and discarded in trash can next to ZHAO's bed.  The DS-160 indicates that Zhao had a consular appointment at the U.S. Embassy in Beijing on June 27, 2018, ostensibly concerning his visa application.  During the course of the search agents also noted that Zhao appeared to be living out of an open suitcase on the floor of his bedroom, with clothing in the suitcase and stacked nearby.

Once the residence was secured, Zhao was taken into custody on the criminal complaint and transported to the FBI's Bloomington office.  There, Zhao consented to an interview with agents. During the interview of Zhao denied that he had ever served in PLA Air Force.  When asked about the picture of him wearing a PLA Air Force uniform, Zhao acknowledged that he was pictured wearing an

actual PLA Air Force uniform, but claimed a co-author of the article had given him the uniform to wear for a picture in an effort to raise the prestige of the paper and the school he was attending at the time. Zhao also repeatedly denied being visited by officials from the PRC Chicago Consulate the day before. It was not until agents confronted Zhao with the fact that the meeting had been observed by an FBI surveillance team that Zhao conceded that he had, in fact, met with officials from the PRC consulate the day before.  When asked what the purpose of the meeting was, Zhao pointed to visa documents on the table that agents had previously shown him and explained the consulate officials told him the U.S. government might contact him (Zhao) because of his military background and experiences at the schools Zhao attended, or words to that effect.  Zhao also told agents that embassy officials had given him a small bag containing snacks and face masks.[5]  During the interview Zhao also told agents that his family was poor and from a small rural community in China.  That background information is at odds with information gathered during the visa application process, where U.S. Embassy officials noted that Zhao's family was affluent and could afford to pay for the cost of Zhao's education at IU.

Following the search of Zhao's residence, the FBI executed a second search warrant at the workspace Zhao occupied in Luddy Hall at Indiana University.  The FBI has now begun the process of forensically examining several electronic devices found in Zhao's residence and workspace, to include computers, tablets, and smart phones.  While that process is far from completion, an initial examination of Zhao's phone revealed that Zhao appears to have deleted nearly all content from the WeChat application on his phone prior to approximately July 11, 2020.  Agents also located a blank military benefits form along with other military related documents and photos on Zhao's iPad, although more time is needed to assess the relevance (if any) of those materials.  Additionally, agents have located a

---

[5] The bag ZHAO was given by embassy officials was located in his residence. Agents noted that the bag and its contents would have easily fit in a standard mailing or shipping package. Agents also noted that the trip from the PRC consulate in Chicago to Bloomington was approximately 246 miles and would have taken more than 4 hours.

photo of Zhao playing soccer for Aviation University of Air Force ("AUAF")[6] on one of Zhao's phones. The photo appears to be from November of 2014, the year after Zhao stated he graduated from AUAF.

### III.    ARGUMENT

Pursuant to § 3142(e)(1), the Bail Reform Act permits the government to move for detention on the basis of flight risk and danger to the community.  The decision whether to detain a defendant as a flight risk pending trial is made by a preponderance of the evidence.  United States v. Motamedi, 767 F.2d 1403, 1407 (9th Cir. 1985).  The government bears the burden of proving risk of flight.  United States v. Gebro, 948 F.2d 1118, 1121 (9th Cir.1991).  Factors to be considered by the Court include: (1) the nature and circumstances of the offense charge, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, (4) danger to the community. 18 U.S.C. 3142(g).

Under 18 U.S.C. § 3142(e)(1), Tang presents a serious risk of flight.  Because there are no conditions of combination of conditions which can reasonably assure Tang's appearance at trial, the Court should detain her.

Notwithstanding Tang's assertions related to her education level, lack of criminal history, familial status, and the potential penalties if she were ultimately convicted of this offense, the facts remain that Tang is an active Chinese military officer who lied about her military status under oath on the J-1 visa application to gain access to the United States.  In short, although her J-1 visa might have been authentic, it was based on fraud and Tang cannot now claim that she came to the United States legally.  Tang's flight to and month-long stay at the Chinese consulate in San Francisco further underscore her consciousness of guilt and her knowledge that she was under investigation by the FBI.

Tang operated clandestinely in the United States, along with apparently several (if not more) of her colleagues.  As the evidence gathered by the FBI in similar cases currently charged in other districts demonstrate, the defendants in these cases are operating in the U.S. with the knowledge and support of their government.  Tang has already demonstrated operational sophistication by deleting materials from her electronic devices and repeatedly making demonstrably false statements to the FBI.

---

[6] As noted in the criminal complaint, Aviation University of Air Force is the PRC's equivalent of the U.S. Air Force Academy.

A PRC military official acting with the support of their government has the resources and ability to flee from the United States regardless of any restrictions this Court could impose.  This is true as a general matter, but is underscored by the evidence, stemming from extremely similar cases, of a coordinated and aggressive response of the Chinese government to law enforcement activity by the United States government.  Specifically, as the Wang case and the L.T. case demonstrate, the Chinese government has instructed PLA members in the United States to obstruct justice by deleting information from their devices.  Tang has, in fact, done just that.  As this case demonstrates, the Chinese consulates in the United States provide a potential safe harbor for a PLA officials intent on avoiding prosecution in this country.  And as the Wang, Zhao, and L.T. cases all demonstrate, the PRC government is intent on protecting its officials from prosecution in the United States.  That the FBI has Tang's passport is of no relevance when the PRC can easily issue a new one, and when it is up to the airlines to decide whether to require a passport on departure.  That is especially noteworthy in the context of the PRC-based airlines that told L.T. to wipe her phone at the airport and warned her that she would be interviewed by CBP prior to departure.

The PRC has demonstrated every reason to assist Tang in fleeing the United States and has at its disposal means such as active consular and intelligence services, the ability to issue passports, and state-controlled air transport.  In addition to an obvious interest in securing the return of a PLA officer, Tang's successful flight from the United States would bolster the PRC's information collection activities in the United States, while undermining the ability of the American criminal justice system to deter the illegal conduct of foreign governments in the United States.

Tang's risk of flight in this case could hardly be greater.  She has no ties to the United States, and could leave the United States at any time without sacrificing anything.  Tang's entire family is now in China.  She is no longer researching/working at UC Davis.  Tang has no verifiable place to live.  In light of the evidence discovered by the FBI pursuant to the search warrant that which the FBI found during its open source research and her repeated lies when confronted, the Court should have serious reservations about not only Tang's credibility, but also her assertions related to the strength of the government's case.  Thus, there is a high likelihood that defendant will successfully flee the United States if released on bond and there are no conditions of release that could ensure her appearance at future proceedings.

Finally, Tang alleges without documentation that she has a medical condition that makes her more vulnerable to COVID19.  Currently, there are 13 reported cases of COVID-19 at the Sacramento County Jail as of July 28, 2020 and but none of these cases are among federal inmates.  Tang does not claim to be infected with COVID-19.  She makes no claim that she was denied necessary medical treatment or care for exposure to COVID-19 or for any other medical condition.  Nor can Tang establish that should she contract COVID-19 while in custody, the facility would be unable to administer constitutionally acceptable treatment.  *Cf.* United States v. Kidder, 869 F.2d 1328, 1330–31 (9th Cir. 1989) (to prevail on Eighth Amendment claim regarding avoiding prison due to medical condition, defendant "must show that no constitutionally acceptable treatment can be provided while he is imprisoned" and collecting cases); United States v. Clark, No. 19-40068-01-HLT, 2020 WL 1446895, at *6 (D. Kan. Mar. 25, 2020) (defendant has not set forth a record establishing that, even if someone at the facility were to contract COVID-19, facility is unprepared to contain the virus or care for those who may become infected).  Tang's circumstances in this instance are not extraordinary.  Many in Sacramento County and other jails face the same risks that Tang does.  Tang should not be released on this basis.

## IV.    CONCLUSION

For all of the above reasons, this Court should find that Tang is a flight risk and order her detained.

Dated:  July 30, 2020

McGREGOR W. SCOTT
United States Attorney


By:   /s/ HEIKO P. COPPOLA
HEIKO P. COPPOLA
Assistant United States Attorney